IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **WYCQ, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:05-cv-0979** |
| | ) | **Judge Trauger** |
| **NATIONAL MUSIC MARKETING, INC.,** | ) | |
| **and JOSEPH R. GROSSMAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant Joseph R. Grossman (Docket No. 45), to which the plaintiff has responded (Docket No. 53), and Mr. Grossman has replied (Docket No. 59). Also pending is Mr. Grossman's Motion to Strike an affidavit and exhibit from the plaintiff's summary judgment response (Docket No. 57), to which the plaintiff has responded (Docket No. 63), and Mr. Grossman has replied (Docket No. 64). For the reasons discussed herein, Mr. Grossman's Motion to Strike will be **GRANTED** in part and **DENIED** in part, and Mr. Grossman's Motion for Summary Judgment will be **GRANTED** in part and **DENIED** in part.

## FACTUAL BACKGROUND

This case arises out of what is primarily a contract dispute between the plaintiff, WYCQ, Inc. ("WYCQ"), and the defendants, National Music Marketing, Inc. ("NMM") and Joseph

1

Grossman.[1] WYCQ is a radio broadcasting company that owns two radio stations that broadcast in the Nashville, Tennessee region.[2] At all relevant times, Mr. Grossman was the president and sole shareholder of NMM, a California corporation, and NMM was engaged in the business of music marketing. To this end, NMM had contracts with a number of recording companies to market musical artists. NMM would in turn enter into contracts with broadcasting companies such as WYCQ to promote those artists through sponsored airtime, on-air competitions, and the like. NMM would bill the recording companies for its marketing services and then use the proceeds it received from the recording companies to in turn pay the broadcasting companies.

In February 2005, NMM entered into an oral agreement (the "Agreement") with WYCQ in Nashville, Tennessee. Brian Krysz, an employee of NMM based in Tennessee, negotiated the terms of the Agreement on behalf of NMM.[3] Under the Agreement,[4] NMM agreed to purchase air time on WYCQ's two Nashville stations, during which time those stations would play music

---

[1]Unless otherwise noted, the facts are drawn from the Complaint (Docket No. 1), the Answer and Counterclaim (Docket No. 15), the parties' summary judgment briefs (Docket Nos. 46, 53, and 59), and the materials submitted in support of those briefs. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

[2]WYCQ occasionally is referred to in documents and by Mr. Grossman during his deposition as "Cromwell" or "the Cromwell Group."

[3]Mr. Grossman testified that Mr. Krysz was "authorized" as NMM's representative, that Mr. Krysz's responsibility was "to go out and get radio stations," and that Mr. Krysz "structured the deal [with WYCQ] on behalf of [NMM]." (Grossman Dep. at 9, 97.)

[4]Although the Agreement was oral, several salient aspects of the Agreement are articulated in a letter dated October 19, 2005 and sent by Mr. Krysz to Bob Reich, a representative of the plaintiff (the "Krysz Letter"). The Krysz Letter is now the subject of a motion to strike brought by Mr. Grossman. *See* Section I.A. *infra*.

2

recorded by artists represented by recording companies who had contracted with NMM, and the stations would identify that airtime as sponsored by NMM or the recording companies. Such sponsored airtime is known in the music industry as "spins." During the course of negotiations, Mr. Krysz represented that NMM would pay WYCQ for the spins upon receiving payment from the recording companies under NMM's marketing contracts with these companies. (Grossman Dep. at 10, 28; Docket No. 53 at 10.) The Agreement further contemplated that NMM would pay WYCQ for spins within ninety days of receiving invoices for the spins, although the parties dispute whether this represented a promise by NMM to pay within ninety days or merely an estimation of how long it would take NMM to pay.[5] Regardless, however, the parties also agreed that, of the proceeds that NMM received from the recording companies, NMM would retain only 15% and would use the remaining 85% to pay for spins purchased under the Agreement.[6] (Grossman Dep. at 10; Docket No. 53 at 12.)

---

[5]The plaintiff asserts that the parties negotiated that "NMM would have a period of ninety days in which to make payment to Plaintiff, thereby allowing NMM sufficient time to collect from recording companies." (Docket No. 1 ¶ 13.) Mr. Grossman, by contrast, testified that, though "[i]t was always NMM's desire to pay the invoices from the radio stations within 90 days" (Docket No. 46 at 3-4), and NMM "would make every attempt to pay in 90 days," it "wasn't set in stone" that payments would be made in that time frame. (Grossman Dep. at 77.) Mr. Grossman also asserts that he "was of the understanding that WYCQ had been informed from the beginning that the record companies are slow payers, but that NMM would do its best to collect the money from the record companies and pay WYCQ. NMM intended to make every effort to pay WYCQ within 90 days." (Docket No. 46 at 4.)

[6]It is unclear whether NMM represented that it would use 85% of the proceeds from the recording companies to pay WYCQ specifically, or that, given that NMM billed recording companies on a project-by-project basis rather than a station-by-station basis, it would use those funds to pay broadcasting companies from which it had purchased spins (and, possibly, other marketing services) including, but not limited to, WYCQ. Nevertheless, regardless of how the particular funds designated for payments to WYCQ were identified or calculated, Mr. Grossman admits, for the purposes of his summary judgment motion, that NMM retained more than 15% of the funds that it received from the recording companies instead of passing those funds on to

3

For nearly a year after the Agreement was entered into, WYCQ played spins under the Agreement and submitted invoices for the spins to NMM, and NMM made payments to WYCQ for the spins.[7] During that time, NMM made payments amounting to more than $700,000 to WYCQ by way of checks drawn on NMM's account and several credit cards. NMM made its last such payment to WYCQ in January 2005, at which time NMM had paid WYCQ for all spins through October 2004 but still had an outstanding balance of approximately $111,690 for spins after November 1, 2004.

It is undisputed that NMM was experiencing substantial financial difficulties when it ceased paying WYCQ for spins. Indeed, the parties do not dispute that NMM experienced cash flow problems as early as 2002, prior to the Agreement. These difficulties were caused, at least in part, by the fact that the recording companies with whom NMM had contracts were delayed in paying NMM's invoices or did not pay those invoices at all, making it difficult for NMM in turn to pay broadcasting companies such as WYCQ.[8] In response to these financial difficulties, NMM developed the "spins program" in 2003 as a means of generating a new source of revenue. NMM also laid off staff, and Mr. Grossman took a 75% pay cut in 2004 and loaned the

---

WYCQ as it had agreed to do, using such funds instead to pay other creditors and for NMM's general operating expenses. (Docket No. 61 at 6-7.)

[7]Mr. Grossman stresses that the recording companies were billed by NMM on a "project by project basis." (Docket No. 46 at 3.) As this court understands it, NMM billed recording companies for all of its marketing efforts on behalf of each artist or album it marketed, rather than billing on a station-by-station basis. Thus, the recording companies were not billed specifically for spins purchased from WYCQ's stations, but rather, for all marketing services, including spins purchased from WYCQ's stations, performed by NMM on behalf of a single artist or album.

[8]The plaintiff alleges, however, and Mr. Grossman does not deny, that NMM in fact ultimately received all the monies owed to it by the recording companies less approximately $38,000.

4

corporation approximately $338,000 of his own funds. Despite these efforts, however, NMM's financial difficulties continued, and it ceased doing business on December 31, 2004. At that time, NMM still owed Mr. Grossman approximately $278,000. Mr. Grossman asserts that he attempted to distribute NMM's remaining funds fairly among NMM's creditors, but that NMM still owed over $1 million to various creditors once its funds were exhausted.[9]

## ANALYSIS

WYCQ filed this lawsuit asserting claims against NMM for breach of contract, fraudulent misrepresentation, and negligent misrepresentation; asserting claims against Mr. Grossman for fraudulent misrepresentation, negligent misrepresentation, tortious interference with contract, and procurement of breach of contract; and seeking to have the corporate veil pierced so that Mr. Grossman may be held liable individually with respect to the plaintiff's claims against NMM. Additionally, WYCQ asserts that it is an intended third-party beneficiary of NMM's contracts with the recording companies and that Mr. Grossman and NMM wrongfully converted those funds for their own benefit.

Mr. Grossman has moved for summary judgment with respect to the claims asserted against him by the plaintiff. Mr. Grossman has also moved to strike two exhibits to the plaintiff's response to his summary judgment motion. The motion to strike will be addressed first, followed by a consideration of whether Mr. Grossman is entitled to summary judgment with respect to the plaintiff's claims.

## I.     Motion to Strike

---

[9]It is unclear whether the $278,000 debt to Mr. Grossman was ever resolved, or whether it is part of the $1 million total debt that remained after NMM's funds were exhausted.

5

In its response to Mr. Grossman's motion for summary judgment, the plaintiff referenced and attached the Krysz Letter and an affidavit submitted by Bayard Walters, the president of WYCQ (the "Walters Affidavit"). Mr. Grossman now seeks to have those documents stricken, and to have stricken any paragraphs in the plaintiff's Statement of Disputed Material Facts that rely on those documents.

A.    *Krysz Letter*

Mr. Grossman claims that the Krysz Letter must be stricken because it constitutes inadmissible hearsay. (Docket No. 58 at 3-4.) Hearsay evidence may not be considered on a motion for summary judgment. *Shipp v. United States*, 212 Fed. Appx. 393, 401-02 (6th Cir. 2006); *see Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("[I]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." (quotation and citation omitted)).

The plaintiff does not claim that the Krysz Letter falls under any of the accepted exceptions to the hearsay rule, *see* Fed. R. Evid. 803, 804, 807, but instead claims that the letter should not be stricken because Mr. Grossman himself testified during his deposition as to the matters asserted in the Krysz Letter. (Docket No. 63 at 5.) The plaintiff asserts that it relies on Mr. Grossman's testimony to prove the statements contained in the letter and that the letter's purpose is solely to "explain and clarify" Mr. Grossman's testimony. (Docket No. 63 at 6.) Thus, the plaintiff essentially appears to claim that the Krysz Letter is not hearsay because it is not introduced for the truth of the matters asserted in the letter.

The plaintiff's argument regarding the nature of the Krysz Letter is not persuasive. In its response to Mr. Grossman's motion for summary judgment, the plaintiff cites repeatedly to the

6

Krysz Letter to establish the content of the oral Agreement. (*See* Docket No. 53 at 6, 9, 17.) For instance, the plaintiff describes the letter as "set[ting] out the agreement which is controlling in this case as to the duties and responsibilities of the parties." (Docket No. 53 at 6.) To the extent that the plaintiff relies on the Krysz Letter as setting forth those duties and responsibilities, the plaintiff is relying on the letter for the truth of the matter asserted—that is, to establish the terms of the Agreement, which the letter purports to characterize.

However, the parties' understanding of the Agreement is, for the most part, undisputed. *See* Factual Background *supra*. Moreover, the plaintiff acknowledges that Mr. Grossman's testimony as to the terms of the Agreement basically is consistent with the characterization of the Agreement contained in the Krysz Letter, and claims that it only relies on Mr. Grossman's testimony to "prove the statements" of the letter. (Docket No. 63 at 5.) If that is the case, then, it is unclear as to why the plaintiff needs to rely on the letter at all.

Finally, the plaintiff argues that Mr. Grossman's testimony with regard to the Krysz Letter was sufficient to authenticate the document and render it admissible. But the plaintiff overstates the import of Mr. Grossman's testimony. Mr. Grossman did not, as the plaintiff claims, give testimony "attesting to [the Krysz Letter's] binding authority." (Docket No. 53 at 6.) Mr. Grossman merely testified that Mr. Krysz was NMM's representative with respect to the Agreement (Grossman Dep. at 9) and that, with certain exceptions, the Krysz Letter's characterization of the Agreement was generally accurate (Grossman Dep. at 77-82). But Mr. Grossman also testified that he had never seen the letter before (Grossman Dep. at 77) and expressed doubt as to the letter's authenticity (Grossman Dep. at 78). Thus, though Mr.

7

Grossman did indeed testify about the Krysz Letter at his deposition, his testimony cannot fairly be said to authenticate that document and render it admissible.

As the Krysz Letter constitutes an out-of-court statement introduced for the truth of the matter asserted, it is inadmissible hearsay and will be stricken.

B.      *Walters Affidavit*

Mr. Grossman seeks to have the Walters Affidavit stricken, as it was made on the basis of Mr. Walters' "knowledge, information and belief." (Docket No. 58 at 2-3.) Mr. Grossman also objects to particular statements in the affidavit on the grounds that those statements pertain to the terms and conditions of the Agreement, despite the fact that Mr. Walters was not directly involved in negotiating the terms of the Agreement. (Docket No. 58 at 2-3.)

A party moving for summary judgment may support that motion with affidavits "made on personal knowledge" that "set forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e). Affidavits must be made on the basis of the affiant's personal knowledge. Fed. R. Civ. P. 56(e). Generally, averments made on information and belief alone—and not on personal knowledge—are insufficient to satisfy this standard and thus are not admissible on a motion for summary judgment. *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 127 F. Supp. 2d 948, 956 (S.D. Ohio 2001). However, an affiant's personal knowledge of averments contained in an affidavit may be manifest in the content of the affidavit, even if the affidavit does not expressly state that the averments are based on personal knowledge. *See id.* ("Although the affidavit, ideally, will expressly state the basis for the facts, in some instances, personal knowledge may be inferred from the content of the statements."). Moreover, corporate officers are deemed to have personal knowledge of the acts of their corporations, and affidavits setting forth such facts are

8

sufficient on a motion for summary judgment. *Findlay Indus., Inc. v. Bohanon*, No. 3:07CV1210, 2007 U.S. Dist. LEXIS 85154, at *9-*10 (N.D. Ohio Aug. 14, 2007) (holding that Corporate Director of Risks and Claims Management is corporate officer with personal knowledge of corporation's acts, and citing *AGI Realty Serv. Group, Inc. v. Red Robin Int'l, Inc.*, No. 94-3911, 1996 U.S. App. LEXIS 10122 (6th Cir. Mar. 28, 1996)).

The fact that Mr. Walters serves as President of WYCQ is sufficient to conclude that he has personal knowledge of the acts of WYCQ, including the terms and conditions of the Agreement and facts relating to the parties' performance of the Agreement. That he was not personally involved in the negotiation of the Agreement is irrelevant, as a corporate officer may have personal knowledge of any number of acts of the corporation that he may not personally have been present for or otherwise involved in. Thus, Mr. Grossman's motion to strike the Walters Affidavit will be denied.

C.     *Statement of Disputed Material Facts*

Finally, Mr. Grossman seeks to have certain paragraphs of plaintiff's Statement of Disputed Material Facts (Docket No. 55) stricken to the extent that those paragraphs rely on the Krysz Letter and the Walters Affidavit. (Docket No. 58 at 4.) As the Walters Affidavit will not be stricken, no paragraphs in the Statement of Disputed Material Facts will be stricken on that basis. Additionally, as none of the paragraphs of the Statement of Disputed Material Facts rely exclusively on the Krysz Letter, no paragraphs will be stricken on that basis.

Thus, Mr. Grossman's request that the court strike certain paragraphs of the Statement of Disputed Material Facts will be denied.

## II.     **Motion for Summary Judgment**

9

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac*

*Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the

evidence offered by the nonmoving party is "merely colorable," or "not significantly probative,"

or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary

judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the

parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v.

White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

A.    *Fraud and Fraudulent Misrepresentation*

In the complaint, the plaintiff purports to assert a variety of fraud-related claims against

Mr. Grossman directly, claiming that Mr. Grossman's actions "constitute fraudulent

misrepresentation in the inducement of Plaintiff to enter into the agreement, fraud in respect to

the conduct of NMM's duties under the agreement, and/or negligent misrepresentation . . . ."

(Docket No. 1 ¶ 22.) In its response to Mr. Grossman's motion for summary judgment, which

addressed the claim of "fraud," the plaintiff reiterates that it is pursuing both a "fraud" claim and

a "fraudulent misrepresentation" claim.[10] (Docket No. 53 at 4 ("The actions of NMM and Mr.

Grossman raise genuine issues of material fact concerning actual fraud as well as fraudulent

misrepresentation in the inducement of Plaintiff to enter into the agreement.").) However, under

Tennessee law,[11] the terms "fraud" and "fraudulent misrepresentation" are synonymous. *Saltire*

---

[10]To the extent that the complaint asserts a claim for negligent misrepresentation against
Mr. Grossman, Mr. Grossman did not move for summary judgment as to that claim.

[11]In the absence of some evidence that the parties intended otherwise, a contract is
governed by the jurisdiction in which it was formed. *Vantage Tech., LLC v. Cross*, 17 S.W.3d
637, 650 (Tenn. Ct. App. 1999) ("Tennessee follows the rule of *lex loci contractus*. This rule
provides that a contract is presumed to be governed by the law of the jurisdiction in which it was
executed absent a contrary intent."). The parties here do not dispute that the Agreement was
formed in Tennessee and that Tennessee law governs its application.

11

*Indus., Inc. v. Waller, Landsden, Dortch & Davis, PLLC*, 491 F.3d 522, 526 (6th Cir. 2007)

(citing *Concrete Spaces, Inc. v. Sender*, 2. S.W.3d 901, 905 n.1 (Tenn. 1999)). Moreover, the

plaintiff's "fraud" and "fraudulent misrepresentation" claims all coalesce around alleged

misrepresentations that the plaintiff claims induced it to enter into the Agreement—or

"promissory fraud," the name by which fraudulent inducement goes in Tennessee.[12] *See Power*

*& Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006); *Houghland v.*

*Houghland*, No. M2005-01770-COA-R3-CV, 2006 Tenn. App. LEXIS 496, at *10 (Tenn. Ct.

App. Jul. 26, 2006).

 To establish a claim of promissory fraud, a plaintiff must establish (1) "an intentional

misrepresentation with regard to a material fact," (2) the defendant's knowledge of the falsity of

the misrepresentation, (3) the plaintiff's reasonable reliance and resulting injury, and (4) that the

---

[12]Both the complaint and the plaintiff's response to Mr. Grossman's summary judgment motion are somewhat confusing in their treatment of the purported fraud claims, and, in the response particularly, the plaintiff raises a number of issues that more aptly relate to its tortious interference and procurement of breach claims and to its claim that the corporate veil should be pierced (*see, e.g.*, Docket No. 53 at 14 ("[B]ased on Mr. Grossman's admissions . . . a jury could legitimately find that Mr. Grossman used NMM as his own piggy bank and as his alter ego for the purposes of escaping liability for fraud, while inducing breach of contract by NMM for Mr. Grossman's personal benefit.")); those arguments will be addressed in the appropriate sections *infra*. In the complaint, the plaintiff does assert "fraud in respect to the conduct of NMM's duties under the agreement" (Docket No. 1 ¶ 22) and the defendants' "fraudulent failure . . . to compensate Plaintiff for services rendered" (Docket No. 1 ¶ 5), but it is unclear how this states a claim for fraud, rather than for breach of contract, which the plaintiff has asserted against NMM. To the extent that the plaintiff does raise issues of fraud, the plaintiff asserts that "NMM entered into an agreement inducing Plaintiff to do work based on a promise that it would receive specific funds from third parties." (Docket No. 53 at 10-11.) Likewise, with respect to its purported fraudulent misrepresentation claim, the plaintiff asserts that "[a] fact question exists concerning whether Mr. Grossman induced Plaintiff to enter into an agreement for payment upon receipt of funds from [recording companies]." (Docket No. 53 at 17.) Thus, the purported fraud and fraudulent misrepresentation claims involve representations that allegedly wrongfully induced the plaintiff to enter the Agreement—that is, promissory fraud.

12

misrepresentation embodied "a promise of future action without the present intention to carry out the promise." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566-67 (6th Cir. 2003) (citing *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). "The most difficult element of this tort concerns the intent not to perform. The statement of intent must be false and not actually held." *Noblin v. Christiansen*, No. M2005-01316-COA-R3-CV, 2007 Tenn. App. LEXIS 354, at *28 (Tenn. Ct. App. May 30, 2007). The mere fact that a promisor has not performed is insufficient to demonstrate that he or she lacked the intent to perform at the time the promise was made. *Power & Tel. Supply*, 447 F.3d at 931 (citing *Oakridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 29 n.2 (Tenn. Ct. App. 1992)); *Noblin*, 2007 Tenn. App. LEXIS 354, at *28 (citing *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 n.3 (Tenn. 1978)). Additionally, the plaintiff's "subjective impression" will not establish a lack of present intent to perform. *Power & Tel. Supply*, 447 F.3d at 931 (citing *Oakridge*, 835 S.W.2d at 29 n.2); *Noblin*, 2007 Tenn. App. LEXIS 354, at *28 (citing *Fowler*, 575 S.W.2d at 499). Thus, a court must deduce a promiser's intent "from a promisor's actions and other circumstantial evidence." *Noblin*, 2007 Tenn. App. LEXIS 354, at *32-*33; *see also Am. Cable Corp. v. ACI Mgmt., Inc.*, No. M1997-00280-COA-R3-CV, 2000 Tenn. App. LEXIS 615, at *15-*16 (Tenn. Ct. App. Sept. 14, 2000) (noting that intent may be divined from "competent evidence tending to establish . . . lack of present intent" or "evidence from which a fact-finder could reasonably infer [lack of present intent").

Mr. Grossman asserts that the plaintiff has not established that any alleged misrepresentations made on behalf of NMM were made with the present intent not to carry out the promise. (Docket No. 46 at 8-9.) The promise at issue here is the promise that NMM would

pass 85% of the funds it received from recording companies through to the plaintiff, retaining only 15% of those funds,[13] and thus the key question is whether, at the time that promise was made, Mr. Grossman had the intention to not pass those funds on to the plaintiff as promised.  In arguing that Mr. Grossman had the present intent not to carry out that promise, the plaintiff largely relies on the fact that the promise ultimately was broken to demonstrate the intent element.  For example, the plaintiff asserts, "If [Mr. Grossman] did not intend for NMM to retain the entirety of funds . . . then he would not have" (Pl.'s Br. 18.), suggesting that an intention *at the time the funds were retained* is sufficient to establish this element of a claim of promissory fraud.  But this argument misapprehends Tennessee law—the question is not whether Mr. Grossman intended to break the promise at the time it was broken, but whether Mr. Grossman never intended to keep the promise at the time it was made.  The mere fact that the promise ultimately was broken does not establish the intent element of a promissory fraud claim.[14]  *See, e.g.*, *Power & Tel. Supply*, 447 F.3d at 931.

The plaintiff does attempt to draw some inferences, based on Mr. Grossman's deposition testimony, to demonstrate his intent at the time the promise was made, asserting that a question

---

[13]As discussed in footnote 6 *supra*, it is unclear whether NMM promised to pay WYCQ 85% of all of the funds from the recording companies or 85% of some portion of the funds from the recording companies, and how the payments to WYCQ were calculated, but the fact is that Mr. Grossman has admitted that NMM ultimately retained more than 15% of funds received from the recording companies and designated in one way or another for WYCQ, as contemplated by the Agreement.

[14]The plaintiff further argues that Mr. Grossman's testimony reveals that he made the decision to retain funds from recording companies instead of passing those funds on to the plaintiff as promised because he had significant personal debts.  (Docket No. 53 at 14.) However, even assuming this were true, it only reveals Mr. Grossman's motivation at the time the promise was broken, and, again, does not reveal his intent at the time the promise was made.

14

of fact exists as to whether, at the time of the promise, Mr. Grossman had the intent to "take funds belonging to Plaintiff" "if and when NMM needed funds." (Pl.'s Br. at 17-18.) The plaintiff points to Mr. Grossman's testimony that NMM began losing money in 2002, well before the parties entered into the Agreement; that Mr. Grossman continued drawing a salary of approximately $400,000 from the corporation, even during a year in which the company lost approximately $800,000, only taking a reduction in salary to approximately $100,000 in 2004, well after NMM began experiencing financial difficulties; and that in 2003, NMM developed the spins program and began marketing on behalf of the recording companies by purchasing spins from various radio stations. (Docket No. 53 at 7-8.) The plaintiff places great weight on Mr. Grossman's statement that the spins program was developed because NMM was "trying to find a new way to create a profit." (Docket No. 53 at 7)

However, none of these facts reasonably permit the inference, as the plaintiff claims, that Mr. Grossman had the present intent not to perform the promise when it was made to the plaintiff, even in light of the consideration that must be given to the nonmoving party on a motion for summary judgment—here, the plaintiff. The fact that NMM paid WYCQ's invoices up until the time that NMM ceased operating further indicates that Mr. Grossman had no present intent not to carry out the promise. The facts merely demonstrate that NMM was experiencing financial difficulties and that Mr. Grossman and NMM sought to resolve those difficulties as one reasonably would expect—by reducing expenses and developing new revenue sources. There is nothing to indicate that either NMM's development of the spins program or Mr. Grossman's statement that the corporation was looking for new ways to make a profit reflect Mr. Grossman's intention to commit a tort by fraudulently promising to pay the plaintiff for spins it purchased

15

while never intending to do so.  Mr. Grossman was simply looking to develop a new business model that would ultimately increase the profits reaped by the company.  Nothing in his testimony suggests that he intended to increase his profits by defrauding the plaintiff or, for that matter, anyone else.

As there is no genuine issue of material fact as to the intent element,[15] summary judgment with respect to the plaintiff's promissory fraud claim against Mr. Grossman will be granted.

### B.    Tortious Interference and Procurement of Breach

The plaintiff also claims that Mr. Grossman should be held liable for procuring NMM's breach of the Agreement.  (Docket No. 1 ¶ 24.)  Tennessee law recognizes a statutory cause of action for procurement of breach of contract[16] as well as a common law cause of action for tortious interference with contract.  *Cambio Health Solutions, LLC v. Reardon*, 234 Fed. Appx. 331, 335 (6th Cir. 2007).  Although somewhat ambiguous, the complaint appears to state both causes of action.  (*See* Docket No. 1 ¶ 5 (asserting "tortious interference with contract rights and/or procurement of breach of contract"); Docket No. 1 ¶ 24 (section regarding "Tortious Interference and Procurement of Breach").)

The elements of the claims of tortious interference and procurement of breach are the same.  Both require (1) the existence of a legal contract, (2) the defendant's knowledge of the contract, (3) the defendant's intent to induce a breach of the contract, (4) malice on the part of

---

[15]As the plaintiff has not established a genuine issue of material fact as to the intent element, there is no need to address the other elements of a promissory fraud claim.

[16]The statute provides that it is "unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto."  Tenn. Code Ann. § 47-50-109.

16

the defendant, (5) breach of the contract, (6) proximate causation, and (7) injury to the plaintiff.[17]

*See Cambio*, 234 Fed. Appx. at 336 (citing *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783

S.W.2d 538, 542-43 (Tenn. 1989)); *Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn. 2002) (citing

seven elements for statutory and common law causes of action); *Blake Corp. v. Diversified Sys.,

Inc.*, No. 98-5396, 2000 U.S. App. LEXIS 22291, at *12-*13 (6th Cir. Aug. 24, 2000) ("[C]laims

for tortious interference with contract and inducement to breach a contract under Tenn. Code

Ann. § 47-50-109 are subject to the same analysis, for § 47-50-109 is but a statutory codification

of the common law tort claim, expressly substituting treble damages for punitive damages.").

Mr. Grossman asserts that the plaintiff has not established that he acted with the intent to procure

NMM's breach of the Agreement, nor that he acted with malice.  (Docket No. 46 at 10-11.)

Additionally, Mr. Grossman asserts that he may not be held liable for interference with contract

under any circumstances because he is the an officer and shareholder of NMM.  (Docket No. 46

at 10-11.)  As this is essentially a threshold issue, it will be addressed first.

A claim of interference with contract requires the existence of a three-party

relationship—that is, the plaintiff, the breaching party, and the interfering party—reflecting the

principle that a party to a contract may not be liable for interference with the contract.  *See

Cambio Health Solutions, LLC v. Reardon*, 213 S.W.2d 785, 789 (Tenn. 2006) (noting the "basic

principle under Tennessee law that a party to a contract cannot be liable for tortious interference

with that contract").  Where there is a "unity of interest between the interfering party and the

---

[17]The claims do differ in that the statutory claim provides for treble damages in lieu of
punitive damages, and in that the statutory claim requires a clear showing of liability rather than
simply proof by a preponderance of the evidence, as it is "in the nature of penalty."  *Cambio*, 234
Fed. Appx. at 336 (citation omitted).

breaching party," no cause of action for interference with contract lies. *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.2d 779, 782 (Tenn. 2000) (discussing *Forrester v. Stockstill*, 869 S.W.2d 328 (Tenn. 1994)). The Tennessee Supreme Court has applied this principle and held that a corporation's directors, officers, and shareholders generally may not be held liable for interfering with the corporation's contracts. *Cambio*, 213 S.W.2d at 790; *Forrester*, 869 S.W.2d at 334-35; *see also Waste Conversion*, 33 S.W.2d at 784 (holding that "a parent corporation is privileged to interfere in the contractual relations of a wholly-owned subsidiary and that it is immune from liability for inducing to breach a contract with another party").

This general rule is not, however, without exception. A director, officer, or shareholder may be held liable for interfering with a corporation's contracts if a plaintiff demonstrates that the director, officer, or shareholder acted contrary to the corporation's economic interests or employed wrongful means. *Waste Conversion*, 33 S.W.2d at 784; *see also Forrester*, 869 S.W.2d at 334-35 (noting that the director, officer, or employee of a corporation may not be liable only if that individual "acts within the general range of his authority, and his actions are substantially motivated by an intent to further the interest of the corporation"); *Blake*, 2000 U.S. App. LEXIS 22291, at *14 (noting that a shareholder is not liable for interfering with corporation's contracts if he or she "acted in good faith in furtherance of the corporation's best interest"). "Wrongful means" include "fraud, misrepresentation, threats, violence, defamation, trespass, restraint of trade, intimidation, molestation, or any other wrongful act recognized by statute or common law." *Waste Conversion*, 33 S.W.2d at 784. Further, a director, officer, or shareholder is only liable if he or she was "not acting in good faith in furtherance of the

18

corporation's best interest" with respect to the "specific conduct *related to the breach of the contract at issue*, not to *all* of their conduct." *Blake*, 2000 U.S. App. LEXIS 22291, at \*16 (emphasis in the original). Ultimately, the "critical factors" in determining whether a corporate director, officer, or shareholder may be held liable for interfering with the corporation's contract is "intent, motive or purpose, and means." *Forrester*, 869 S.W.2d at 333.

Here, Mr. Grossman asserts that he was not acting outside the scope of his duties as President of NMM. (Docket No. 46 at 10.) He asserts that the cash flow problems that NMM experienced were the result of the recording companies' failures to pay NMM under their contracts with NMM, and that NMM made every effort to pay its creditors fairly and quickly. (Docket No. 46 at 10.) The plaintiff has asserted, however, that, regardless of any cash flow problems that NMM may have experienced as the result of the recording companies' failure to pay NMM, NMM ultimately received all of the funds owed to it by the recording companies less approximately $38,000 (Docket No. 53 at 10), a fact that Mr. Grossman does not deny (Grossman Dep. at 31). Mr. Grossman further admits that he had loaned NMM a substantial sum of money himself and indicated that he had personal financial concerns related, at least in part, to the reduction in his salary and the loans he made to NMM. (Grossman Dep. at 27, 32.) Finally, Mr. Grossman admits that, of the funds that NMM ultimately received from the recording companies, NMM did not pass on the portion of those funds designated for WYCQ, as it had agreed to do. (Grossman Dep. at 25; *see also* nn. 6, 13 *supra*.)

Although it is far from clear where those funds from the recording companies ultimately ended up, the inference may reasonably be drawn that those funds made their way instead into NMM's general accounts and were then used to pay NMM's creditors, presumably including

Mr. Grossman, and that Mr. Grossman directed the breach of the contract so as to increase the money available to NMM's general accounts, from which he himself would be reimbursed for the loans he made to the company. These facts raise a genuine issue as to whether, in directing NMM's breach of the Agreement, Mr. Grossman was substantially motivated by an intent to further NMM's best interest or, rather, that he was substantially motivated by an intent to make more money available to the pool of funds that would be used to pay back other of NMM's creditors including, notably, himself. As a result, Mr. Grossman is not entitled to summary judgment on the basis that he may not be liable as an officer and shareholder of NMM. Additionally, these same facts establish that an issue of fact exists as to the intent element of the plaintiff's interference with contract claims, leaving only the question of whether the plaintiff has raised an issue of fact as to the malice element.

Malice is defined as "the wilful violation of a known right." *Crye-Leike Realtors, Inc. v. WDM, Inc.*, C.A. No. 02-A01-9711-CH-00287, 1998 Tenn. App. LEXIS 641, at *17 (Tenn. Ct. App. Sept. 23, 1998) (quotation and citation omitted). To demonstrate malice, the plaintiff need not show that Mr. Grossman "showed ill will toward the plaintiff," but rather that his conduct simply was "intentional**,** and without legal justification." *Dowlen v. Weathers*, No E2004-00857-COA-R3-CV, 2005 Tenn. App. LEXIS 289, at *24 (Tenn. Ct. App. May 17, 2005) (quotation and citation omitted). There is a genuine issue of material fact as to malice based on the evidence already discussed. Also, as will be discussed in Section II.C. *infra*, there is sufficient evidence that Mr. Grossman abused the corporate form to favor certain creditors and divert corporate assets, precluding summary judgment on the plaintiff's claim that the corporate

20

veil should be pierced, which is likewise sufficient to establish a genuine issue of material fact as to whether Mr. Grossman acted without legal justification under the malice element.

Thus, as the plaintiff has raised a genuine issue of material fact as to the intent and malice elements of its tortious interference and procurement of breach claims,[18] summary judgment on these claims would be improper.

### C.    Piercing the Corporate Veil

In addition to the claims that it asserts against Mr. Grossman directly, the plaintiff asserts that the corporate veil should be pierced and that Mr. Grossman should be held directly liable with respect to the claims that the plaintiff asserts against NMM.  (Docket No. 1 ¶ 27.)

As a general matter of Tennessee law, a corporation is considered a distinct legal entity independent from its directors, officers, and shareholders, and thus a corporation's directors, officers, and shareholders are not usually liable to the corporation's creditors.  *See Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991).  However, the fiction of the corporate veil may be pierced and directors, officers, and shareholders held liable where there is evidence of "some violation of a statutory duty or other conduct which establishes a privity of contract with or tortious injury to the creditor."  *Id.* at 924.  The concept of piercing the corporate veil is "an equitable doctrine to prevent the use of a corporate entity to defraud or perform illegal acts." *Nepp v. Hart*, No. M2005-2024-COA-R3-CV, 2006 Tenn. App. LEXIS 596, at *22 (Tenn. Ct. App. Sept. 7, 2006) (citing *Schlater*, 833 S.W.2d at 925).  Thus, piercing the veil is appropriate given "special circumstances, such as, that the corporation is a sham or dummy so that failure to disregard it would result in an injustice."  *Elec. Power Bd. of Chattanooga*, 691 S.W.2d 522, 526

---

[18]There is no dispute as to the other five elements of these claims.

(Tenn. 1985); *Emergicare Consultants, Inc. v. Woolbright*, No. W1998-00659-COA-R3-CV, 2000 Tenn. App. LEXIS 838, at *5 (Tenn. Ct. App. Dec. 29, 2000) ("Corporate veils are pierced when the corporation is liable for a debt but it is without funds due to some misconduct on the part of the officers and directors.").  When a party seeks to pierce the corporate veil and hold a corporation's directors, officers, or shareholders liable, that party bears the burden of demonstrating facts warranting the piercing of the veil.  *Schlater*, 833 S.W.2d at 925; *Oceanics Schs., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003).

There are a number of factors that Tennessee courts look to in determining whether it is appropriate to pierce the corporate veil in a particular case, including:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships between related entities.

*Fed. Deposit Ins. Co. v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984), *cited in, e.g., Oceanics*, 112 S.W.3d at 140.  No one factor, however, is conclusive in determining whether to pierce the corporate veil.  *See Schlater*, 833 S.W.2d at 925 ("Generally, no one factor is conclusive in determining whether or not to disregard a corporate entity; usually a combination of factors is present in a particular case and is relied upon to resolve the issue."); *Oceanics*, 112 S.W.3d at 140 ("It is not necessary that all of these factors weigh in a plaintiff's favor in order to justify the piercing of the corporate veil.").  Moreover, the particular considerations may vary from case to

22

case. *See Elec. Power Bd. of Chattanooga*, 691 S.W.2d 522, 526 (Tenn. 1985) ("The conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case . . . ."); *Schlater*, 833 S.W.2d at 925 ("Each case involving disregarding of the corporate entity must rest upon its special facts.").

Whether or not to pierce the corporate veil is a question of fact. *See Elec. Power Bd.*, 691 S.W.2d at 526 ("[A] determination of whether or not a corporation is a mere instrumentality of an individual or a parent corporation is ordinarily a question of fact for the jury."). The issue must be approached "with great caution and not precipitately, since there is a presumption of corporate regularity." *Schlater*, 835 S.W.2d at 925. Thus, Tennessee courts have expressed hesitance about ruling on claims that the corporate veil should be pierced in the context of a motion for summary judgment.[19] *See, e.g., Mike v. Po Group, Inc.*, 937 S.W.2d 790, 795 (Tenn. 1996) ("Ordinarily, a determination of whether to pierce the corporate veil is not appropriate for summary judgment.") (citing *Elec. Power Bd.* 691 S.W.2d at 526); *but see Cent. Nat'l Ins. Co. v. Dana Corp.*, 900 F.2d 259 (6th Cir.) (suggesting that Sixth Circuit permits courts to make determinations regarding piercing the corporate veil on summary judgment motion despite Tennessee state court decisions that summary judgment is an improper vehicle for such rulings).

---

[19]It is worth noting that, in this case, it is not the party seeking to pierce the corporate veil but rather the party who seeks to prevent the veil from being pierced who has moved for summary judgment. In such a case, the rationales counseling hesitancy with regard to ruling on piercing the corporate veil on summary judgment are diminished. However, the motion will still be approached with due caution and awareness of the fact that the question is usually a fact-intensive one.

23

In support of its argument for piercing the corporate veil, the plaintiff cites, among others, the facts that Mr. Grossman was the sole owner of the NMM stock, that he allegedly diverted assets from NMM to himself to the detriment of NMM's creditors, specifically WYCQ, and that he abused the corporate form by providing preferential treatment to certain creditors. (Docket No. 53 at 23-24.)  Specifically, the plaintiff claims that, in making the determination that NMM would not pass on to WYCQ a designated portion of the funds it received from the recording companies as it had agreed, Mr. Grossman effectively favored certain creditors over others.  (Docket No. 53 at 15-17, 24.)  The plaintiff further claims that Mr. Grossman's decisions on behalf of NMM were driven by primarily selfish motives, in that Mr. Grossman was experiencing his own personal financial difficulties at the time.  (Docket No. 53 at 16-17.) Indeed, Mr. Grossman testified as to his own personal financial problems, including his mortgage and the fact that he personally had loaned NMM a substantial sum of money (Grossman Dep. at 27, 32), although he denies that this was a motivating factor with respect to his decisions on behalf of NMM (Docket No. 59 at 9-10).[20]

Mr. Grossman, by contrast, claims that piercing the corporate veil is not warranted in this case because there is no evidence of any misconduct on his part that resulted in the injuries alleged by the plaintiff.  (Docket No. 46 at 12-13.)  Mr. Grossman has indicated that the loans he made to NMM were documented (Grossman Dep. at 27) and that, when NMM ceased to exist,

---

[20]There does not appear to be any evidence that Mr. Grossman diverted corporate assets to himself beyond that which he was owed by the company.  As has already been discussed *supra*, however, the inference may be drawn that Mr. Grossman effectively diverted corporate assets from one use to another—that is, that instead of using funds received from the recording companies to pay WYCQ, that money was diverted to the pool from which WYCQ's creditors generally were to be paid.

NMM still owed Mr. Grossman over $200,000 (Docket No. 46 at 5-6), undermining the plaintiff's argument that Mr. Grossman used his position wrongfully to favor one creditor, such as himself, over others, such as the plaintiff.  Finally, although Mr. Grossman admits that NMM did not pass 85% of the funds received from the recording companies to WYCQ as agreed (Docket No. 61 at 6-7), he asserts that he made every effort to treat creditors fairly and stresses that his decisions were driven solely by the financial difficulties that NMM, was experiencing (Docket No. 53 at 7; Grossman Dep. at 105-06).

If anything, however, the fact that the parties have such disparate perceptions of this issue requires the conclusion that summary judgment would be in inappropriate here, particularly in light of the Tennessee courts' warning that piercing the corporate veil is generally a highly fact-specific determination.  The plaintiff has established that an issue exists, particularly with regard to the question of whether Mr. Grossman retained funds that were to be paid to WYCQ under the Agreement for his own benefit or for the purpose of favoring certain creditors over others.  Thus, as there is a genuine issue of material fact as to whether it would be appropriate to pierce the corporate veil in this case, Mr. Grossman's motion for summary judgment will be denied.

D.    *Conversion*

Finally, the plaintiff alleges that it was an intended third-party beneficiary of NMM's agreements with the recording companies and that the defendants wrongfully converted the plaintiff's funds for their own benefit.  (Docket No. 1 ¶ 29.)  Mr. Grossman has moved for summary judgment with respect to these claims to the extent that they are asserted against him individually.  (Docket No. 46 at 13-16.)

25

The third-party beneficiary rule permits a third party to sue to enforce a contract if it demonstrates that it was an intended beneficiary of a valid contract. *See Owner-Operator Indep. Drivers Assoc., Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001). It is unclear what the import of asserting a third-party beneficiary claim against Mr. Grossman would be, as such a claim would seem to entail having the contracts enforced as against the recording companies, rather than as against Mr. Grossman. Moreover, as the plaintiff acknowledges, the recording companies largely have satisfied their obligations under their contracts with NMM with the possible exception of $38,000 owing to NMM. (*See* Docket No. 53 at 22.) Finally, and most significantly, the plaintiff has adduced absolutely no evidence that it in fact was an intended beneficiary of NMM's contracts with the recording companies, rather than an incidental beneficiary. *See Owner-Operator*, 59 S.W.3d at 68 ("Under the modern rule, third parties may enforce a contract if they are intended beneficiaries of the contract. If, on the other hand, the benefit flowing to the third party is not intended, but is merely incidental, the third party acquires no right to enforce the contract." (citations omitted)).

To establish that it was an intended beneficiary, the plaintiff must demonstrate that (1) the parties to the contract have not agreed otherwise, (2) recognizing the third party's right to performance would effectuate the parties' intent, and (3) the terms of the contract suggest either that performance would satisfy an obligation or discharge a duty owed to the third party by the promisee or that the promisee intends to give the third party the benefit of the contract's performance. *Id.* at 70. There is no evidence here that NMM and the recording companies anticipated that any particular broadcasting company, let alone WYCQ specifically, would be

directly benefitted under those contracts.[21]  At most, the defendants entered into contracts with the recording companies that incidentally benefitted broadcasting companies such as WYCQ.  In fact, the parties' submissions imply that NMM's contracts with the recording companies predated the Agreement between NMM and WYCQ (Docket No. 1 at 3; Docket No. 53 at 9), which would seem to preclude any inference that the WYCQ was an intended beneficiary of those contracts.  Moreover, there is no evidence that obtaining the recording companies' performance of their contracts with NMM would benefit WYCQ; as WYCQ itself has acknowledged, the recording companies in fact have largely satisfied their obligations to NMM under those contracts, although, according to WYCQ, it has yet to receive the benefits of that performance.  Indeed, WYCQ's argument that Mr. Grossman wrongfully retained funds received from the recording companies and designated for WYCQ essentially torpedoes its third-party beneficiary claim, as there would seem to be no point of enforcing NMM's contracts as against the recording companies where the recording companies themselves have largely performed and the reason that any benefit, intended or incidental, of those contracts has not flowed to the plaintiff is solely the result of the defendants' alleged breach and its tortious conduct vis a vis the plaintiff.  Thus, if indeed the plaintiffs intended to assert a third-party beneficiary claim against Mr. Grossman, summary judgment is appropriate on that claim.

To the extent that this allegation asserts a claim for conversion against Mr. Grossman, such a claim requires a showing that Mr. Grossman appropriated the plaintiff's property to his own use or benefit by the exercise of dominion over that property in defiance of the plaintiff's

---

[21]As NMM's contracts with the recording companies are not contained in the record, the assertions made by Mr. Grossman and the plaintiff in their respective submissions are the only indicia of the parties' intent.

right.[22]  *See River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 60

(Tenn. Ct. App. 2002) (citing *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W. 2d 833,

836 (Tenn. Ct. App. 1977)).  Mr. Grossman argues that any funds not paid to the plaintiff

represent a debt, rather than the plaintiff's property, and thus that no conversion claim lies.

(Docket No. 46.)  However, the terms of the Agreement are sufficient to permit the inference that

the plaintiff had a right under the Agreement to 85% of the funds (or 85% of some portion of the

funds, *see* nn. 6, 13 *supra*) paid to NMM by the recording companies, and that those funds were

diverted so that they could be used to pay other of NMM's creditors, including particularly Mr.

Grossman, rather than being used to pay WYCQ as promised.  Moreover, as the facts indicated

that Mr. Grossman himself directed an was significantly involved in determining which creditors

would be paid (Grossman Dep. at 105-06), he may be personally liable for the alleged

conversion.  *See The Judds v. Pritchard*, CA. No. 01A01-9701-CV-00030, 1997 Tenn. App.

LEXIS 647, at *9, *12-*13 (Tenn. Ct. App. Sept. 24, 1997) (reversing trial court grant of

summary judgment to plaintiff with respect to conversion claim against corporate president who

effectively controlled company where one could infer that allegedly converted funds "would

ultimately inure to his benefit").  Thus, summary judgment as to the conversion claim against

Mr. Grossman is inappropriate.

---

[22]The parties do not address whether Tennessee law or California law governs the conversion claim and, to the extent that they cite any case law, they rely on Tennessee law. Regardless, although worded somewhat differently, the elements for establishing a conversion claim in California are basically the same as those in Tennessee.  *See Bagsby v. Gehres*, 225 Fed. Appx. 337, 347 (6th Cir. 2007) ("Under California law, the elements of conversion are: 1) the plaintiff's ownership or right to possession of the property; 2) the defendant's conversion by a wrongful act or disposition of property rights; and 3) damages.") (citing *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, (Cal. Ct. App. 1998)).

Case 3:05-cv-00979   Document 66   Filed 01/03/08   Page 28 of 29 PageID #: 565

## CONCLUSION

For the reasons discussed herein, the defendant Mr. Grossman's Motion to Strike will be

**GRANTED** in part and **DENIED** in part, and the defendant Mr. Grossman's Motion for

Summary Judgment will be **GRANTED** in part and **DENIED** in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge